PETER JOHN POELS ET AL., APPELLANTS, V. JOSEPH BROWN ET AL., APPELLEES.

FILED APRIL 18, 1907.    No. 14,771.

1. **Evidence: DAMAGES.** The amount of damages awarded by a jury must be sustained by ascertained and established facts, or it will be set aside.

2. **Factors: SALES.** A factor is not required to depart from his usual and established custom in the sale of goods consigned to him, and especially is this so when he has made large advances on the goods and a different course might subject him to loss.

APPEAL from the district court for Seward county: ARTHUR J. EVANS, JUDGE. *Reversed.*

*McGilton & Gaines* and *M. D. Carey,* for appellants.

*Norval Bros., contra.*

ALBERT, C.

In June, 1903, the appellees shipped to London 250 head of fat cattle. The cattle were consigned to the ap-

pellants, a commission firm engaged in selling cattle and other animals for slaughter at Deptford, which, as we understand from the evidence, is one of the principal cattle markets supplying meat for the city of London. Through arrangements with plaintiff's agent in New York, appellants advanced £17 a head upon the cattle before shipment. On the arrival of the cattle at the Deptford market they were sold by appellants, the proceeds realized being insufficient to pay the advance made upon the cattle prior to their shipment, the deficiency being £165 10d. Appellee accompanied the shipment, and after the sale of the cattle, being apparently without sufficient funds to pay the expense of his return trip, the sum of £25 was loaned him by appellants, who shortly thereafter drew upon him for the money so loaned, together with the £165 10d., the amount of the deficiency arising on a sale of the cattle above referred to. Appellees failing to pay the draft, this action was commenced by the appellants in the district court for Seward county to recover the amount. The answer admits that the appellants advanced to Brown £25 as a loan, and they admit that the amount realized from a sale of the cattle was £165 10d. less than the advance made thereon. Their answer contains a counterclaim in which it is alleged that prior to the sale of the cattle they instructed the appellants to sell them by dressed weight; that the plaintiffs disregarded these instructions and sold on the hoof; that by reason thereof defendants were damaged to the amount of about $5,000, for which sum judgment was prayed. A trial resulted in a verdict for the defendants and appellees for $2,346.

Appellants contend that this verdict is not supported by the evidence, and they urge in support of this contention that there was no sufficient proof offered by the appellees to show the measure of damages. They further urge that the appellants were live stock factors, that being their exclusive business; that they had no means for slaughtering cattle, and that the market at Deptford was devoted exclusively to the sale of live stock and was not a dressed

meat market.   Relating to the measure of damages, the evidence shows that the cattle were weighed at Seward just previous to their shipment.   Their total live weight is given.   Evidence was further produced to show that attle in their condition would, after being slaughtered, yield about 60 per cent. of their live weight in dressed beef; that what is known as the "offal," consisting of the head, tongue, etc., was worth $15 a head; that prior to the sale appellants had stated to the appellees that dressed beef was worth from 11½ to 12 cents a pound in London. It is further shown that a crippled steer belonging to one Wilson, who accompanied the Browns with something over 200 head of his own cattle, and which were sold by appellants at the same time, was slaughtered at Deptford, and hat appellants accounted to Wilson for the proceeds in the sum of £18 7s. 2d., being as much as the highest price brought by any of the appellees' cattle, and nearly $10 more a head than some of them were sold for.   It is further claimed that all of the animals sold were of a better grade and weighed more than the crippled steer. It is  also shown that just prior to the sale, and while the cattle were tied to the stalls in the market, Mr. Poels, who conducted the sale, stated that they were a fine lot; that he pointed out certain bunches or strings of the animals saying, "this lot will bring £22," another £19, and a third £18 a head; and on the showing of these facts it is attempted to sustain a verdict.

As to the proof of damages, we cannot do better than to quote from the opinion in *Poels v. Wilson*, 77 Neb. 73, which might be called a companion case with the one we are considering.   As in that case, there is here no claim of fraud: "Nowhere does it appear what would have been the cost of slaughtering and dressing the cattle.   There is considerable evidence tending to show the relative value of the isolated crippled steer and the other cattle, and to the effect generally that the isolated steer was worth $25 less than the others.   Plaintiff accounted to defendant for

53

the crippled steer in the sum of $89.16. Defendant's evidence shows that this particular steer was inferior to at least 140 head of the cattle sold on foot. In the account returned by plaintiff to defendant, no charge was made for slaughtering and marketing this steer, and defendant contends that the sum received for this one animal was a sufficient guide for the jury in measuring the damages. Such a conclusion, however, can be drawn only by an unreasonable inference. While it appears from the account rendered to the defendant that $89.16 was the net proceeds of the crippled steer, yet, when we consider that that was only a small part of a very large transaction between the parties wherein numerous items of expense were charged, we cannot conclude that all of the 223 head of cattle could have been disposed of and a return made to the defendant herein at that rate." All of the objections made in the above quotation from the opinion of Mr. Commissioner EPPERSON appear in the case we are now considering.

It further appears from the undisputed evidence of appellants' witnesses that appellants had no facilities for slaughtering cattle; that, while there were slaughter pens at the Deptford market, they were rented by butchers who resorted to that market for the purpose of purchasing cattle on the hoof, slaughtering them at pens and taking the dressed beef to their own market place. George Philcox testified that he was superintendent of the foreign cattle market at Deptford; that he had occupied that position for 33 years and ever since the formation of the market. He says the market was opened for public use in 1871 for the sale and slaughter of live cattle, sheep, etc; that "there is no dead market there. The animals are sold alive to wholesale butchers who kill them in slaughter houses which they rent from the corporation, and the carcasses are taken pricipally to the London Central market at Smithfield and the Aldgate market, also in the city of London, or to the shops of the buyers. Unless special instructions are given to the contrary by the consignors,

animals are, and always have been, sold alive by the consignee. The purchasers of these live animals have to slaughter them within ten days, exclusive of the day of landing, under the order of the board of agriculture." Other witnesses testified that the market was exclusively for the sale of live animals, except in the case of crippled and diseased animals which were killed under the direction of the board of agriculture, and one purchaser of a portion of the animals in question testified that the practice at the Deptford market was to sell the animals alive. "If we found Mr. Poels killing bullocks, we should not go near him. We would have boycotted him."

There is no competent evidence in the record that Poels & Company, the appellants, conducted the business of selling slaughtered animals. The testimony of those having personal knowledge of the fact is that their exclusive business was to sell on the hoof, and, if this be so, it would be unreasonable to ask them to sell animals as dressed meat as it would to demand of a grain broker that he should procure the grain consigned to him to be ground and sold as flour. There is some evidence relating to the manner of the sale tending to support the theory that Mr. Poels, the salesman, was careful to keep from the appellees the price bid for the animals until after the sale was concluded; but there was no claim made that they were sold for less than the market price. If the sale was not conducted in the usual manner, if there was a market for dressed beef at Deptford, if a part of the business of Poels & Company was to sell animals in the manner requested by the Browns, that proof can be produced and ought to be brought before the court. It cannot be expected, and the law does not demand, that Poels & Company should depart from their usual and customary method of conducting their business unless some good reason be shown therefor, and especially is this so when advances to the value of the cattle have been made. The law presumes that these cattle were consigned to Poels & Company to be sold in the usual manner in which their

business was conducted. If that method was not satisfactory to the appellees they should have consigned to other parties who conducted the business along lines conforming to their wishes. If, as testified by defendants' witnesses, the cattle would have brought less as dressed beef than as live cattle, the defendants had their own interest to protect and might exercise their discretion in making the sale to secure themselves against loss on account of the advancement made. *Feild v. Farrington,* 10 Wall. (U. S.) 141; *Brown v. McGran,* 14 Pet. (U. S.) 479.

We do not think that the verdict of the jury can be supported from the evidence in the record, and we recommend a reversal of the judgment and remanding the cause for another trial.

DUFFIE and JACKSON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the cause remanded for another trial.

REVERSED.